UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WILMER M. R.-R.,** | Civil Action No. 20-6773 (SDW) |
| **Petitioner,** | |
| v. | **OPINION** |
| **JOHN TSOUKARIS, et al.,** | |
| **Respondents.** | |

**WIGENTON,** District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Petitioner, Wilmer M. R.-R., filed pursuant to 28 U.S.C. § 2241. (ECF No. 1). Also before the Court is Petitioner's motion seeking a temporary restraining order. (ECF No. 3). Following an order to answer, the Government filed responses to the petition and motion (ECF Nos. 13-16, 20), to which Petitioner has replied. (ECF Nos. 19, 21). The parties also filed consent motions seeking to seal Petitioner's medical records. (ECF Nos. 6, 17). For the following reasons, this Court will deny the petition without prejudice, will deny the motion as moot in light of the denial of Petitioner's habeas petition, and will grant the motions to seal.

**I. BACKGROUND**

Petitioner is a twenty-five year-old native and citizen of the Dominican Republic. (Document 1 attached to ECF No. 1 at 2). Petitioner illegally entered the United States without inspection or admission sometime in or around 1997 when he was two years old. (*Id.*; Document 13 attached to ECF No. 8 at 2). In 2014, Petitioner applied for and was granted deferred action under the Deferred Action for Childhood Arrivals (DACA) program. (Document 8 attached to

1

ECF No. 13 at 2).  That deferred action expired, however, in March 2016 when Petitioner failed to reapply for that status.  (*Id.*).  During his time in this country, Petitioner has amassed a considerable criminal history both as a juvenile and as an adult.  (*See, e.g.,* Document 8 attached to ECF No. 13 at 2-3; Document 9 attached to ECF No. 13).  Most recently, and most relevant to this matter, Petitioner was convicted of felony possession of a controlled substance, specifically heroin, and resisting arrest and eluding in 2016 in New Jersey.  (*Id.*).  Based on these convictions and Petitioner's illegal entry status, immigration officials placed a detainer request upon him while he was imprisoned, and upon his release from his criminal sentence, Petitioner was taken into immigration custody pursuant to 8 U.S.C. § 1226(c) and served with a notice to appear for removal proceedings on February 27, 2020.  (Document 10 attached to ECF No. 13).  Petitioner has remained detained pursuant to § 1226(c) since that time.  While Petitioner requested and received a custody hearing before an immigration judge in March 2020, he was denied bond as the immigration judge determined that his drug conviction and conviction for a crime of moral turpitude both rendered him subject to mandatory detention without bond under § 1226(c). (Document 11 attached to ECF No. 13).  Following the arrival of COVID-19 in the Essex County facility, Petitioner also requested release on humanitarian parole, which was denied on May 14, 2020.  (Document 12 attached to ECF No. 13).

In early June, one of Petitioner's lawyers contacted Director Ortiz of the Essex County facility, and requested that Petitioner be listed as a medically vulnerable detainee in support of Petitioner's attempts to seek release from the Government.  (Document 1 attached to ECF No. 19 at 24).  After conferring with Dr. Anicette, the head of the facility's medical facility, Ortiz referred Petitioner to immigration officials "for possible release consideration."  (*Id.*).  The Government, however, determined that Petitioner's release was not warranted.  Although Petitioner contends

that the referral amounted to a direct recommendation by Anicette and Ortiz that the Government *should* release Petitioner, and that the decision to deny him release was made by the Government in contradiction to Anicette's medical advice, Dr. Anicette clarified in a certification that while he "concurred" that Petitioner should be referred for release consideration, he "made that referral in response to [Petitioner's lawyer's] request" and neither he nor his medical staff "advised ICE that it should release [Petitioner] for either medical or mental health reasons." (Document 1 attached to ECF No. 20). Indeed, Dr. Anicette certified that the jail's medical department "is capable of treating appropriately [Petitioner's] medical and mental health conditions." (*Id.*).

When he was first detained at the Essex County Correctional Facility, Petitioner, who at the time reported being in good health (*see* Document 8 attached to ECF No. 13 at 1), underwent an intake screening. During this screening, Petitioner indicated only two ongoing medical conditions – foot pain deriving from a prior Achilles tendon surgery, and hypertension for which he received the medication Norvasc – and a history of having received psychiatric treatment in childhood. (ECF No. 15 at 3-8). Petitioner also received a TB screening and chest X-ray, neither of which indicated any need for treatment. (*Id.* at 8-10). On February 29, 2020, Petitioner was seen by a nurse practitioner, who again noted Petitioner's history of hypertension which was being ably treated by Norvasc, but ordered diagnostic blood tests. (*Id.* at 12-13). These blood tests indicated "slightly elevated" levels of a chemical called ALT, which could, but need not be indicative of liver disease. (*Id.* at 16-17; ECF No. 14 at 3-4). After Petitioner confirmed that he had received similar results in the past, a hepatitis test was ordered, which indicated that Petitioner did not have hepatitis C and was immune to hepatitis B. (*Id.* at 16-20). On March 8, Petitioner was also scheduled for an initial psychiatric evaluation, but he refused to meet with mental health professionals. (*Id.* at 20).

Petitioner first sought medical aid in the jail on March 9, 2020, claiming that he had pain in his right Achilles tendon relating to his having had his legs cuffed during his transfer to the jail and his prior surgery. (*Id.* at 21). Petitioner's foot was evaluated and he was provided pain medication. (*Id.* at 22-23). Petitioner returned on March 11, claiming that the medication was not alleviating his pain, and he was provided with a higher dose of pain medication and additional medication to help address the issue. (*Id.* at 26-27). On March 17, he again returned claiming his pain was still not fully addressed by his medication. (*Id.* at 28). He was seen by a nurse practitioner the following day who continued his medication and ordered an X-ray. (*Id.* at 28-31).

On March 25, 2020, Petitioner again sought medical treatment, this time for difficulty sleeping and racing thoughts. (*Id.* at 33-34). He was referred for mental health treatment. (*Id.* at 34-35). Petitioner returned the following day with resumed foot pain and a swollen ankle. (*Id.* at 36-37). A nurse provided him with more pain medication, medication for his athlete's foot, instructions to rest and elevate his ankle, and to return if the issue persisted. (*Id.*). On March 27, 2020, Petitioner was seen by a mental health worker and evaluated relating to his sleep issues and claimed anxiety related to the COVID-19 pandemic. (*Id.* at 40-41). Petitioner received a psych referral as a result. (*Id.* at 41-42). Petitioner was seen by a psychiatrist on March 31, who diagnosed him with adjustment disorder with anxiety and ordered medication to help Petitioner deal with his anxiety. (*Id.* at 44-45). Petitioner thereafter received a psychiatric follow up visit on April 6. (*Id.* at 51-52).

On April 17, Petitioner again returned to medical, stating that he had not taken his blood pressure medication that day. (*Id.* at 53). He was seen by a nurse practitioner. (*Id.* at 54-55). On April 18, Petitioner returned for a sick call, complaining of asthma related breathing issues, for which he claimed he had been treated in the past. (*Id.* at 56). Petitioner's vitals were taken and

4

found to be normal, and he was provided albuterol to aid with his mild asthma. (*Id.* at 56-59). On April 24, 2020, Petitioner was seen by the psychiatrist for a mental health follow-up and his anxiety medication was changed. (*Id.* at 61-65). On May 3, Petitioner returned to medical claiming renewed leg pain and was evaluated by a nurse, resulting in further evaluation by medical professionals on May 7. (*Id.* at 65-67). As a result, he was again given an X-ray of his leg and pain medication. (*Id.* at 67-69). On May 11 and May 28, he received additional mental health follow-ups, and his anxiety medication was adjusted on both occasions. (*Id.* at 69-72, 75-77). On May 28, 2020, Petitioner's asthma medication was also changed to a different form of inhaler after a follow-up medical visit and asthma evaluation, during which Petitioner confirmed that his "asthma got better." (*Id.* at 79-81). Petitioner received a follow-up for his foot issues on June 1, at which point his X-rays were found to be negative for any visible problems. (*Id.* at 85-86). On June 1, Petitioner was also given a COVID-19 antibody test screening, which revealed that Petitioner tested positive for antibodies, indicating that it is likely that Petitioner had already had, and was now likely immune to, the virus. (*Id.* at 86).

On June 2, Petitioner sought further treatment, claiming that his transfer back into a room with another inmate had caused him more anxiety as he was afraid of getting sick. (*Id.* at 87-89). Petitioner also complained of more ankle pain. (*Id.* at 89). Petitioner was moved to a bottom bunk, given ibuprofen, and moved to a different location within the facility's dorms. (*Id.* at 89-93). On June 5, Petitioner received a follow up mental health visit after he complained of increased anxiety, and his medication was again adjusted. (*Id.* at 90-93). On June 7, Petitioner was given further blood tests, following which Petitioner was advised to start a diet and exercise more to address his lipid issues. (*Id.* at 98-99). Nothing in Petitioner's medical records indicates that he

5

ever had a fever or reported any COVID-like illness or breathing issues not related to his asthma. (*Id.* at 1-129).

In support of his petition, Petitioner has submitted two certifications from a medical expert, Dr. Kim Strong Griswold, addressing his medical issues and vulnerability to COVID-19. (Document 3 attached to ECF No. 1; Document 1 attached to ECF No. 19). In her certifications, Dr. Griswold opines that, based on Petitioner's medical records, she believes that Petitioner is at "high risk of serious medical complications" if he were to contract COVID-19. (Document 3 attached to ECF No. 1 at 6). The doctor bases this conclusion on Petitioner's obesity, and his history of asthma, anxiety, and depression, as well as her belief that Petitioner's ALT levels could be indicative of "liver disease," all of which she believes place Petitioner at increased risk. (*Id.* at 6).

In opposition, the Government has provided a certification from Dr. Carl Postighone. (ECF No. 14). In his certification, Dr. Postighone disputes that Petitioner's mental health issues or medication put him at increased risk, and argues that, even if Petitioner does have asthma, that asthma is at worst quite mild and not likely to greatly exacerbate a potential COVID-19 infection. (*Id.* at 3). He further disputes the suggestion that Petitioner has liver disease – noting that nothing in the record suggests this, and Petitioner's raised ALT levels could not be attributed to liver issues rather than Petitioner's obesity based on the current record. (*Id.* at 3-4). Likewise, Dr. Postighone asserts that Petitioner's hypertension is not severe and is well managed by Petitioner's current medication, and thus is unlikely to exacerbate a potential COVID-19 infection. (*Id.*). Based on his evaluation of Petitioner's records, and Petitioner's youth, Dr. Postighone opines that Petitioner is in an "extremely low risk category" for serious COVID-19 complications. (*Id.* at 4-5). Finally, the doctor opines that Petitioner, who at the time had been seen by medical staff at the jail at least

twenty-three times in a four month period, had received medical care "well above national communal standards" and likely better than Petitioner would have received outside of the jail. (*Id.* at 5).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2241(c), habeas relief may be extended to a prisoner only when he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A federal court has jurisdiction over such a petition if the petitioner is "in custody" and the custody is allegedly "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). As Petitioner is currently detained within this Court's jurisdiction, by a custodian within the Court's jurisdiction, and asserts that his continued detention violates due process, this Court has jurisdiction over his claims. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 494-95, 500 (1973); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

### B. Analysis

In his habeas petition and briefing, Petitioner argues that he should be released from immigration detention because he has been subjected to punitive conditions of confinement and has received insufficient medical care in light of his medical history and the threat posed by the COVID-19 epidemic. As this Court recently explained, assuming the COVID-19 pandemic is a sufficiently severe circumstance that would warrant permitting a habeas claim based upon Petitioner's conditions of confinement, claims such as Petitioner's

7

could be construed in two fashions – as a claim asserting that the jail has been deliberately indifferent to Petitioner's medical needs, or as a claim asserting that the conditions under which he is detained amount to an unconstitutional application of punishment without a supporting conviction in violation of the Due Process Clause. As there is no clear guidance from the Courts of Appeals or Supreme Court on how to adjudicate such claims in light of an ongoing pandemic, many courts have found that insufficient jail action in light of the virus can serve as a basis for release under [the circumstances], *see, e.g,*, *Rafael L.O. v. Decker*, No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Cristian A.R. v. Thomas Decker, et al*., No. 20-3600 (D.N.J. Apr. 12, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted. *See, e.g., Dawson v. Asher*, No. 20-409, 2020 WL 1304557 (W.D. Wa. Mar. 19, 2020) (rejecting TRO request because detainees could not succeed on merits of request for relief without at least showing concrete likelihood of actual injury as opposed to mere speculation in light of the legitimate governmental interest in detaining aliens throughout removal proceedings); *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020) (rejecting habeas TRO based on medical conditions of confinement claim as that claim normally must be brought under § 1983, and in any event such a claim is not likely to succeed in the absence of a showing of deliberate indifference to the detainees medical needs); *Lopez v. Lowe*, No. 20-563, 2020 WL 1689874 (M.D. Pa. Apr. 7, 2020) (denying request for TRO by habeas petitioner as he could not establish deliberate indifference to his medical needs).

Turning first to the issue of Petitioner's medical needs, for an immigration detainee to make out a claim for relief based on a jail official's insufficient treatment or deliberate indifference to his medical needs under the Due Process Clause, he must show both that he is subject to a sufficiently serious medical need, and that jail officials have been deliberately indifferent to that need. *See, e.g., Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017); *King v. Cnty. of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008). Even assuming that [the threat of] COVID-19 in and of itself is a sufficiently serious need, or that Petitioner's [asthama] is sufficiently serious to oblige the jail to take action to alleviate the

risk presented by the virus, success on such a claim would still require Petitioner to show that officials at the jail were deliberately indifferent to that need – i.e. that Respondents "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety." *Natale*, 318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This requires that the [respondent] was "both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . dr[e]w th[at] inference." *Id.* Where some treatment or proscriptive action designed to alleviate the medical need has been provided and the dispute is over the adequacy of the treatment or preventative steps taken, federal courts "are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)). Neither a detainees subjective dissatisfaction or disagreement with the professional judgment of medical staff as to how best to deal with a medical issue are normally sufficient to establish deliberate indifference. *Hairston v. Director Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

. . . .

. . . A claim challenging conditions [of confinement] under the Due Process Clause [under the theory that those conditions amount to punishment in the absence of a supporting conviction in turn] has both a subjective and objective component – the objective component requiring a showing that the deprivation involved in the conditions was sufficiently serious, and the subjective component requiring that jail officials act with a sufficiently culpable mind. [*Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979))]. The subjective component can be established by showing an express intent to punish; or by showing that the conditions in question were arbitrary, purposeless, or excessive in relation to the ascribed governmental objective. *Id.* Conditions which are reasonably related to a legitimate government interest and which are not excessive in relationship to that interest will therefore not support a claim in the absence of a showing of an express intent to punish. *Id.* at 67-69. . . . [I]mmigration detention is clearly reasonably related to a legitimate government interest – the Government's interest in securing those subject to removal proceedings pending the conclusion of those proceedings in order to ensure they do not abscond and that they attend those proceedings while also ensuring they are not a danger to the community in the

9

>meantime.  *See, Dawson*, 2020 WL 1304557 at *2; *see also Jennings*, 138 S. Ct. at 836; *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas*, 533 U.S. at 690-91.

*Jorge V.S. v. Green*, No. 20-3675, 2020 WL 1921936, at *2-4 (D.N.J. Apr. 21, 2020).

In this matter, Petitioner is detained pursuant to the Government's mandatory detention authority under 8 U.S.C. § 1226(c), which applies to aliens such as Petitioner who have qualifying convictions, such as Petitioner's drug and moral turpitude convictions.  As the Supreme Court has held, mandatory detention under § 1226(c) "serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings," an interest that the Court went to considerable lengths to explain was compelling and a more than adequate basis for mandatory detention throughout the pendency of removal proceedings.  *See Demore*, 538 U.S. at 518-28. Both the Third Circuit and this Court have further recognized that the statute further serves the purpose of ensuring that criminal aliens do not present a danger to the community while they are in removal proceedings.  *See, e.g., Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 209 (3d Cir. 2020); *Chavez-Alvarez v. Warden York County Prison*, 783 F.3d 469 (3d Cir. 2015); *Dryden v. Green*, 321 F. Supp. 3d 496, 502 (D.N.J. 2018).  Indeed, these interests are so compelling that this Court has recognized that the statute will even support continued detention without so much as a bond hearing for well over a year absent other circumstances compelling such a hearing.[1] *Id.*; *see also Santos*, 965 F.3d at 211 (rejecting a bright line rule requiring a bond hearing after any

---

[1] In his petition, Petitioner does not argue that his detention, which at this point has not yet crested six months, has become so prolonged as to require a bond hearing, nor does he request a bond hearing under *Chavez-Alvarez*, *Santos*, or their progeny.  Absent the showing required by *Santos* to warrant a bond hearing – that the length, reasons for delay, and punitive nature or lack thereof of civil detention weigh in favor of a finding that Petitioner's detention has become so prolonged that its continuance without a bond hearing violates the petitioner's Due Process rights – this Court concludes that Petitioner's current detention without a bond hearing remains constitutional under the statute and thus supports the Government's strong interest in detaining aliens with qualifying criminal convictions pending the conclusion of removal proceedings.  965 F.3d at 211-213.

set period of time, even one over a year, and instead requiring duration of detention to be only one factor to be considered). It is therefore clear that Petitioner's continued detention pending the resolution of his removal proceedings serves a clear and legitimate government interest.

Turning to the conditions of Petitioner's confinement, the jail in which Petitioner is detained has taken numerous concrete steps to alleviate and mitigate the risk COVID-19 presents to its inmate population. The jail has increased the availability of medical staff; insured nurses, practitioners, and doctors are either on hand or on call at all times; limited or eliminated entrance into the facility of outside vendors, volunteers, and visitors; has required medical screenings for all incoming detainees and staff members including temperature checks upon arrival; begun the daily monitoring and separate housing of those detainees who suffer from health conditions putting them at high risk under CDC guidelines; established a quarantine area for those who become infected; made a nurse available for all medical complaints in "every housing unit twice daily;" increased supplies on site including cleaning supplies and COVID-19 testing kits; increased cleaning staff and has begun sanitizing and cleaning housing units "no less than three times per day;" provided "unlimited access to soap and unlimited access to water" to all detainees and provided disinfectant spray upon request under the supervision of jail staff; begun placing new arrivals in quarantine for fourteen days before placing them in general population; provided masks, gloves, and full protective equipment to jail staff for use when necessary; and "is in the process of testing its entire population using rapid testing antibody screening" for COVID-19 antibodies to support the jail's quarantine and containment strategy. (Document 2 attached to ECF No. 20 at 2-17). The jail has also put into place policies for handling infected inmates including immediate medical evaluations for those showing symptoms, providing daily sick calls to detainees, providing surgical masks to those with signs or symptoms of respiratory illness, full testing at University

Hospital for any detainee who shows moderate to severe symptoms, the quarantining of those who show even mild symptoms, and the isolation of detainees who have tested positive for the virus. (*Id.* at 11-14).  Where warranted, antiviral medications are provided, and regardless of the need for medications, those who test positive or show even mild symptoms are quarantined for fourteen days in single occupancy cells.  (*Id.* at 11-13).  All of these measures taken to limit or alleviate the effects of COVID-19 on the jail population clearly show that the conditions to which Petitioner has been subjected are not excessive in relation to the Government's interest in detaining criminal aliens, and that the conditions under which Petitioner has been confined are instead rationally related to a legitimate government interest and therefore pass constitutional muster.  As Petitioner has not otherwise shown any express intent to punish him, Petitioner's conditions of confinement claim fails to set forth a basis for habeas relief.

Petitioner's claim is no stronger when construed as a direct medical claim.  Both the concrete steps outlined above and the significant medical treatment and medication Petitioner has received indicate that the jail staff have not been deliberately indifferent to his needs, but have instead taken steps to protect him and have treated his medical issues when he has brought them to the attention of the medical staff.  As Petitioner has failed to show that staff were deliberately indifferent to his needs, his medical claim must fail, notwithstanding the fact that the jail cannot guarantee that he will not become ill with COVID-19.  *V.S.*, 2020 WL 1921936 at *3 ("That these steps do not guarantee Petitioner will remain healthy and free of the disease is immaterial, the constitution requires no such perfection."); *see also Sacal-Micha;* 2020 WL 1518861 at *6.

As this Court finds that Petitioner has neither shown that jail staff have been deliberately indifferent to his medical needs, nor that he has been subjected to unconstitutional conditions of confinement, Petitioner's habeas petition is denied, and Petitioner's motion seeking a temporary

restraining order is denied as moot in light of the denial of this matter.  Given Petitioner's interests in the confidentiality of his medical records, the consent of the parties, and the fact that filings in immigration habeas cases are not presumptively available to the public at large, this Court will grant the motions to seal Petitioner's medical records.

### III. CONCLUSION

For the reasons set forth above, Petitioner's habeas petition (ECF No. 1) is DENIED WITHOUT PREJUDICE and his motion seeking a temporary restraining order (ECF No. 3) is DENIED as moot in light of the denial of his habeas petition.  The parties' consent motions to seal Petitioner's medical records (ECF Nos. 6, 17) are GRANTED.  An appropriate order follows.


Dated: August 14, 2020

*s/Susan D. Wigenton*
Hon. Susan D. Wigenton,
United States District Judge